**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

- - - - - - - - - - - - - )
MARVIN KLEHR and MARY KLEHR, )          Case No. 3-94-CIV-424
                )
       Plaintiffs,   )
                )
   vs.               )          **MEMORANDUM OF DEFENDANT**
                )          **A.O. SMITH HARVESTORE**
A.O. SMITH CORPORATION and  )          **PRODUCTS, INC. IN SUPPORT**
A.O. SMITH HARVESTORE      )          **OF MOTION FOR**
PRODUCTS, INC., Jointly and )          **SUMMARY JUDGMENT**
Severally,             )
                )
       Defendants.   )
- - - - - - - - - - - - - )

### INTRODUCTION

     Defendant A.O. Smith Harvestore Products, Inc. ("AOSHPI") has moved the Court for summary judgment on all of plaintiffs' claims based upon the expiration of the applicable statute of limitations. All of the claims in this lawsuit arise from the plaintiffs' purchase of a Harvestore silo on July 15, 1974 for use in their dairy operation.  Plaintiffs did not commence this lawsuit until August 23, 1993, *over 19 years after purchasing the silo*.

     The procedural history of this litigation is twisted and complex, and has been briefed to the Court in excruciating detail in several prior motions.  AOSHPI refers the Court to its Memorandum in Support of Motion for Preservation of Files dated September 10, 1993; its Memorandum in Support of Motion for Costs and for Stay of Proceedings Under Fᴇᴅ. R. Cɪv. P. 41(d) dated September 29, 1993; and Magistrate Judge Franklin Noel's December 21, 1993 Order granting defendants' Motion for Costs.  Only a brief summary of the litigation will be repeated here.

     Plaintiffs originally sued defendants AOSHPI, A.O. Smith Corporation ("Smith") and independent dealer MVBA Harvestore Systems ("MVBA") in Scott County District Court in June 1991

("state court action").  In that case, plaintiffs alleged claims of common law fraud, common law negligent misrepresentation, violation of the Minnesota False Statement in Advertising statute, MINN. STAT. § 325F.67, violation of the Minnesota Consumer Fraud Act, MINN. STAT. §§ 325F.68-.70, violation of MINN. STAT. § 325D.13 and violation of the Minnesota Uniform Deception Trade Practices Act, MINN. STAT. § 325D.44.

For over two years, the parties engaged in protracted litigation in the state court action.  The case was scheduled for trial beginning on September 21, 1993.[1]  On August 18, 1993, without any prior notice, plaintiffs filed a Notice of Voluntary Dismissal pursuant to MINN. R. CIV. P. 41.01, unilaterally dismissing the state court action without prejudice.  The voluntary dismissal was filed immediately after plaintiffs learned of the expected testimony of an independent fact witness named Charles Crafts.  Mr. Crafts worked on the plaintiffs' dairy farm as a farmhand from January 1993 to June 1993.  Mr. Crafts had voluntarily initiated contact with AOSHPI's counsel to report information he had learned from conversations with Marvin Klehr about his lawsuit.  The substance of Marvin Klehr's discussions with Mr. Crafts is set forth in the Affidavit of Charles H. Crafts, Jr., submitted to the Court in

---

[1] Defendants also moved for summary judgment in the state court action. The state court denied defendants' motion in one sentence, stating only that there were "genuine issues of material fact surrounding the timing and reasonableness of the discovery of the fraud . . . and the timing of the discovery of causation and fraudulent concealment of the grounds for the remaining claims."  The court did not specify what issues of material fact existed regarding those issues.  Since the state court denied the defendants' motion on July 15, 1993, at least four courts, including three in Minnesota, have granted summary judgment to the defendants based on facts similar to the facts in this case.  *See infra* cases and discussion at pp. 16-19.  These recent summary judgment decisions, unavailable at the time summary judgment was considered in the state court action, reflect a growing consensus of judicial opinion that cases filed 15 to 20 years after the purchase of the product cannot survive under the statute of limitations.

support of AOSHPI's Motion for Costs on September 29, 1993.   In essence, Mr. Crafts alleges he was told by Marvin Klehr that the plaintiffs' lawyers instructed Mr. Klehr to give false testimony at his deposition on a number of issues, including the defendants' statute of limitation defenses.   *See* Crafts Aff.

On August 27, 1993, nine days after dismissing the state court action, plaintiffs filed this action in federal court.   The claims alleged in this action are virtually identical to the claims in the state court action, with two exceptions:  (1) plaintiffs have added federal RICO claims against AOSHPI and Smith; and (2) plaintiffs have dropped their claims against Minnesota-based MVBA.   Plaintiffs' Amended Complaint[2] includes nine separate counts:   common law fraud (Counts I and II); civil claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts III and IV); common law negligent misrepresentation (Count V); violation of Minn. Stat. § 325F.67 (Count VI); violation of Minn. Stat. §§ 325F.68-70 (Count VII); violation of Minn. Stat. § 325D.13 (Count VIII); and violation of Minn. Stat. § 325D.44 (Count IX).   All nine counts are based on allegations that the defendants misrepresented the performance capabilities of the Harvestore silo.

The undisputed evidence in this case demonstrates that plaintiffs realized almost immediately after they began using the Harvestore silo in 1975 that the structure was not performing as represented and that they were realizing none of the promised benefits which allegedly caused them to buy it.   Despite this knowledge, plaintiffs delayed over 19 years before commencing this lawsuit.   Based on the plaintiffs' own sworn deposition testimony,

---

[2]  Plaintiffs amended their Complaint on November 26, 1993 to plead their fraud and RICO claims with greater specificity.

all of their claims are barred by the statute of limitations.

**STATEMENT OF FACTS**

The following facts, which AOSHPI accepts as true *solely* for the purposes of this motion, are taken entirely from the plaintiffs' own sworn deposition testimony[3] and Amended Complaint:

Plaintiffs operate a dairy farm near Shakopee, Minnesota. On July 15, 1974, plaintiffs purchased a 25' x 80' Harvestore silo for storing alfalfa haylage. Amended Complaint at ¶ 13. The silo was manufactured by AOSHPI and sold to the plaintiffs by an independent Harvestore dealer, MVBA. *Id.* A second Harvestore silo, purchased by Marvin Klehr's father in 1955, has been in continuous use on the Klehr farm from 1955 to the present. *See* Marvin Klehr Deposition attached as Exhibit 1 to the Affidavit of Blake Shepard, Jr. ("M.K. Dep.") at 21, 22, 54. The 1955 silo is not part of this lawsuit.

A. **What Plaintiffs Were Told**

Plaintiffs allege they purchased the 1974 silo in reliance upon representations made by MVBA salesman, Richard Deutsch, and written advertisements published by AOSHPI. Specifically, plaintiffs claim they purchased the silo based on the following representations:

1. There would be no spoiled or moldy feed from the Harvestore because oxygen would not contact the feed during storage. M.K. Dep. at 150, 156, 166, 611-12;

2. Because no oxygen would contact the feed during storage, plaintiffs would have better feed quality. *Id.* at 149, 151, 154, 156, 169, 181-82, 183;

3. Because of the higher quality feed, plaintiffs would have healthier cows. *Id.* at 151, 154, 169, 183, 237, 613;

---

[3] The depositions of both plaintiffs were taken in the state court action, and constitute admissions by a party-opponent. FED. R. EVID. 801(d)(2).

4. Because of the higher quality feed, plaintiffs would realize an increase in milk production of 3-5 pounds per cow per day. *Id.* at 149-51, 156, 169, 183, 269;

5. Because of the higher quality feed, plaintiffs could drastically reduce or eliminate the need to buy protein supplements to add to their rations. *Id.* at 156, 169; and

6. Plaintiffs would realize more profits, and as a result, the silo would pay for itself in four to five years. *Id.* at 150, 156, 158, 169, 183.

Both plaintiffs understood when they purchased the Harvestore silo that all of the promised benefits flowed from the claim that it would prevent oxygen from coming in contact with the feed. *See* Mary Klehr Deposition attached as Exhibit 2 to the Shepard Aff. ("Mary Klehr Dep.") at 34, 35; M.K. Dep. at 150, 151, 154, 156-57, 166, 169, 611-12. Marvin Klehr testified at his deposition:

Q   Did Mr. Deutsch give you any sort of explanation as to why you might expect more production?

A   Because of the better quality feed that we would get out of the silo.

Q   *Did he tell you why you might expect to have better quality feed coming out of the Harvestore?*

A   *Because oxygen did not come in contact with the feed.*

Q   Do you recall anything else that he told you with respect to this item of more production?

A   Well, *the better feed would make healthier cows and healthier cows would make more milk.* And you could put up your haylage at an earlier stage, saving more protein or save more leaves, which would give you better feed quality. . . . *All these things would give you more production.*

M.K. Dep. at 151. Similarly, Mary Klehr testified:

Q   Tell me what specifically you can recall Mr. Deutsch telling you about the Harvestore silo.

A   Well, I guess one thing that sticks out in my mind is the idea that *no oxygen got in contact with the feed*

> *and, therefore, you would have better feed, better,*
> *healthier cows, more production and more money.*
>
> * * *
>
> Q  *Did he explain to you why the Harvestore silo would give*
>    *you better feed?*
>
> A  *I guess because air didn't come in contact with the*
>    *feed; therefore you would have better feed.*

Mary Klehr Dep. at 34-35 (emphasis added).

Before purchasing the 1974 silo, Marvin Klehr was an experienced farmer, having lived and worked on his family farm for 48 of his 49 years. Long before 1974, he knew that mold and spoilage was caused by the access of oxygen. M.K. Dep. at 114, 115-19. During his lifetime as a farmer, Klehr had seen spoilage in his stave silos and in feed he stored in piles on the ground, and knew the spoilage was caused by oxygen. *Id.* at 116-19.

## B.  What Plaintiffs Experienced

Plaintiffs now claim they never obtained the benefits they were promised from the Harvestore silo. In fact, plaintiffs now allege that *beginning in 1975*, their experience was *directly contrary* to the representations they relied on when they bought the silo.

### 1.  Feed Quality and Appearance

Plaintiffs were told before they purchased the Harvestore silo that they would have no spoiled or moldy feed because no air would contact the feed, and that the feed would be of higher quality than conventionally stored feeds. Contrary to these representations, they now claim they had moldy, spoiled feed *each and every year beginning in 1976*.

Plaintiffs first filled the Harvestore silo with haylage in the spring of 1975. M.K. Dep. at 273. Within weeks, the feed changed in color from green to brown and took on a molasses smell. *Id.* at 276-77. In July and August 1976, at the end of the feed from

6

the 1975 harvest, Marvin Klehr saw chunks of mold in the feed for approximately one month. *Id.* at 287-89. Based on the promises made to him before he purchased the silo, Klehr did not expect to see any mold. *Id.* at 294. Klehr was concerned about the mold, because he had been assured he would not have any mold in the feed and because he had not seen mold in any of the advertising brochures he read before he bought the silo. *Id.* at 294.

In the spring of 1977, at the end of the feed from the 1976 harvest, Marvin Klehr again saw chunks of mold in the feed, and noticed the feed became darker brown. *Id.* at 297-98. Klehr noticed the feed developed "a musty smell." *Id.* at 299. At the end of the feed stack, Klehr had to load spoiled feed into his manure spreader and dump it in the field. *Id.* at 304. Based on the defendants' pre-sale representations, he did not expect to see moldy, musty feed. *Id.* at 299.

In the spring of 1978, Klehr noticed for the third straight year that the feed in the Harvestore silo "got very musty and we seen a significant amount of mold." *Id.* at 302. The feed became "much darker brown" during the end of the feed stack. *Id.* at 303. In the spring of 1978, for the second year in a row, Klehr had to haul the spoiled feed out to the field and dump it. *Id.* at 304.

*Each year after 1978*, Klehr continued to notice the same problems with the Harvestore feed. Each year, he saw chunks of mold in the winter. *Id.* at 348-49. Each spring he saw moldy, spoiled feed. *Id.* Each year he had to haul spoiled feed to the field and throw it out. *Id.* Each year, the chunks of mold ranged from the size of a quarter to the size of a half dollar. *Id.* at 362.

## 2. __Herd Health__

Before he bought the Harvestore silo, Marvin Klehr was told his cows would be healthier because of the higher quality feed. Contrary to this promise, Klehr now claims his herd had a rash of health problems beginning immediately after he began feeding from the Harvestore, none of which he had ever experienced before.

Beginning in *approximately 1980*, Klehr noticed his dairy herd began to have diarrhea and digestive problems. M.K. Dep. at 412-13. Beginning in *approximately 1983*, he noticed his cows were "going off feed," or refusing to eat their ration. *Id.* at 415. Shortly *after 1975*, when he began feeding from the Harvestore silo, Klehr began to have problems with displaced abomasums, or "twisted stomachs." *Id.* at 420-21. Before 1975, he had never had a problem with twisted stomachs in his herd. *Id.* at 421. In the late 1970's, Klehr was informed by his veterinarian that the twisted stomachs were caused by the consumption of fine chopped feed, such as the haylage stored in his Harvestore silo. *Id.* at 421-22.

Klehr also noticed an unusually high number of uterus infections in his herd, beginning *after 1975* when he started feeding from the Harvestore silo. *Id.* at 427. The problem became particularly severe in the *early 1980's*. *Id.* At that time, Klehr talked to his feed salesmen about the problem because he *"always felt that [the cows were] lacking some type of a vitamin or something."* *Id.* at 427-28 (emphasis added).

*Beginning around 1980*, Klehr also noticed "foot problems" in his dairy herd. *Id.* at 430. He was concerned about the foot problems because they had an adverse effect on milk production and the longevity of his cows. *Id.* at 430-31. Klehr talked to his feed salesman about the problem, who prescribed additional selenium

8

and minerals for the dairy ration. *Id.* at 431.

*As early as 1977*, Klehr noticed that many of his cows had swelling and bruises around the joints on their hind legs. Before 1977, Klehr had never seen this condition on his farm. *Id.* at 437. When asked whether he thought the foot and joint problems were caused by the Harvestore silo, Klehr testified: "I can't say yes or no, *but all I know is I had more foot problems and more leg problems and more health problems than I had before.*" *Id.* at 439 (emphasis added).

Klehr also noticed his cows were thin and unthrifty. *Id.* at 440-41. Klehr discussed the problem with his feed salesmen *before 1980*. *Id.* at 442. Klehr never had this problem before he began using the Harvestore silo in 1975. *Id.* at 445.

Klehr also noticed his dairy cows had rough hair coats and dull eyes after he began using the Harvestore in 1975. *Id.* at 445-47. After 1975, the cows did not shine or look as nice as they did before 1975. *Id.* Klehr talked to his feed salesman about the problem in the 1970's. *Id.* at 446-47. The feed salesmen agreed the cows were thin and rough, and told Klehr "*they knew that these cows were still lacking something.*" *Id.* at 445-46 (emphasis added).

### 3. Breeding and Reproduction

In contrast to the promise that he would have healthier cows, Klehr began to have substantial breeding and reproduction problems in his dairy herd shortly after he began using the Harvestore silo in 1975. Klehr began to have poor conception rates (*i.e.*, percentage of cows bred during their periods of heat) soon after he began using the silo. *Id.* at 468-69. Klehr recalls his conception rate during the years he used the Harvestore silo was "very poor,"

9

and that he was "very dissatisfied with it." *Id.* at 535. Klehr confirmed the problem by looking at his monthly Dairy Herd Improvement Association ("DHIA") farm records, and noticed the problem had been going on for *approximately ten years* before he filed his state court lawsuit in 1991. *Id.* at 535-36.

Over the years, Klehr also began to have problems with long calving intervals, an important measurement of breeding efficiency. *Id.* at 463-64. Klehr felt that his calving intervals were too long, compared to the reported averages for farmers in Minnesota and Scott County. *Id.* at 464-65. Klehr also had spontaneous abortions or miscarriages, *beginning after 1975* when he started using the Harvestore. *Id.* at 478-79. Klehr never had a problem with abortions or miscarriages before 1975. *Id.* at 479.

### 4. Milk Production

Plaintiffs relied on representations that because of the higher quality feed, they could expect their milk production to increase by three to five pounds per cow per day. By contrast, plaintiffs now claim they *never* received any of the milk production increases they were promised.

After filing the state court lawsuit in 1991, Marvin Klehr reviewed his milk production history as reported in his DHIA records. By looking at the records, he determined his milk production "was not going anywhere over the years." M.K. Dep. at 512. Klehr admits he received DHIA records *every month during the entire period he used the Harvestore silo. Id.* at 386, 512-13, 714-15. Thus, the evidence of Klehr's allegedly substandard milk production was on his desk, available for examination on a monthly basis from 1974 to 1991. However, Klehr did not complain to anyone about his milk production *until 1990*, when he told Mr.

10

Deutsch for the first time that he felt his cows should be produc-
ing more milk. *Id.* at 378-79.

### 5. **Protein Savings**

Plaintiffs relied on promises that because of the higher
quality feed, they could drastically reduce or eliminate protein
supplements from their rations. Contrary to these representations,
Marvin Klehr claims he *never* realized any of the protein savings
he was promised during the 17 years he used the Harvestore silo.
M.K. Dep. at 699-701. Rather, every time his rations were prepared
after 1975, he *always* had to continue to add protein supplements
for his dairy cows. *Id.*

### 6. **Profitability**

Plaintiffs claim they relied on promises that the silo would
pay for itself in four to five years and would increase the
profitability of their dairy operation. They now claim they *never*
realized the financial benefits they were promised. Rather,
plaintiffs claim they experienced extreme financial hardship *in the
early 1980's* because their milk checks were "not big enough." M.K.
Dep. at 591-92. Mary Klehr testified that plaintiffs were "fina-
ncially strapped" from the early 1980's until 1991 or 1992 because
milk production was down. Mary Klehr Dep. at 23, 104-06.

After filing the state court lawsuit in 1991, Marvin Klehr
reviewed his DHIA records and determined for the first time that
Deutsch's representations of increased profitability were false.
*Id.* at 511-12. However, Klehr received monthly DHIA records during
the entire period he was using the Harvestore silo. *Id.* at 714-
15, 512-13. Thus, the evidence that the Harvestore silo was not
delivering the promised increase in profits was in Marvin Klehr's
own records, available for his monthly review, from 1975 to 1991.

## ARGUMENT

Under Rule 56, a moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment should be denied only where a *genuine issue* of *material fact* is in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Irrelevant and unnecessary facts should have no bearing on a trial court's consideration of a motion for summary judgment. *Id.* Summary judgment under Rule 56 is appropriate if "there can be but one reasonable conclusion" to be drawn from the facts. *Id.* at 250. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Statutes of limitations are favored under Minnesota law. *Roe v. Widme*, 191 Minn. 251, 254, 254 N.W. 274, 276 (1934). The general purpose of the statute of limitations is to "prescribe a period within which a right can be enforced, afterwards withholding a remedy for reasons of private justice and public policy." *Bachertz v. Hayes-Lucas Lumber Co.*, 201 Minn. 171, 176, 275 N.W. 694, 697 (1937). It is based upon a "well-founded policy which discourages the instituting of lawsuits based on claims which have long since become stale, if not moribund." *Bustad v. Bustad*, 263 Minn. 238, 244, 116 N.W.2d 552, 556 (1962).

Plaintiffs commenced this lawsuit on August 27, 1993. A six-year statute of limitations applies to all of plaintiffs' state

law claims, and a four-year statute governs plaintiffs' RICO claims. Therefore, plaintiffs' state law claims are barred if the statute of limitations began before August 27, 1987, and the RICO claims are barred if the statute commenced to run before August 27, 1989. Here, plaintiffs' testimony establishes they knew of facts, as early as 1976 and certainly well before 1987, that were directly contrary to the representations which allegedly caused them to buy the silo. Their "discovery" of these facts triggered the running of the statute of limitations. Based on plaintiffs' own sworn admissions, the Court must dismiss all of plaintiffs' claims.

## I.   THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' FRAUD CLAIM

The statute of limitations applicable to plaintiffs' common law fraud claim is governed by MINN. STAT. § 541.05, subd.1(6). The statute prescribes a six-year limitations period, which is triggered upon "the discovery by the aggrieved party of the facts constituting the fraud. . . ." *Id.*

The statute imposes an *objective*, rather than a subjective, standard of diligence upon the plaintiff. Under Minnesota law, the *means* of discovery are tantamount to actual discovery, and "the facts constituting the fraud are deemed to have been discovered when, with reasonable diligence, they could and ought to have been discovered." *Bustad v. Bustad*, 263 Minn. 238, 242, 116 N.W.2d 552, 555 (1962). The failure to actually discover the fraud does not toll the statute of limitations if it is inconsistent with reasonable diligence. *Id.* "A knowledge of *facts which would have put an ordinary prudent man upon inquiry* which, if followed up, would have resulted in the discovery of the fraud, [is] equivalent to actual discovery." *Duxbury v. Boice*, 70 Minn. 113, 120, 72 N.W. 838, 839 (1987) (emphasis added). In other words, the statute of

limitations begins to run when a plaintiff knows, *or should know*, of facts which are inconsistent with the representations he relied upon in entering into the transaction. *See Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 674 (D. Minn. Dec. 14, 1993).

Under this objective standard, the statute of limitations will not wait for the plaintiff to decide in his own mind that he has been defrauded, or to gather absolute *proof* of all the elements of his fraud claim. Instead, the statute is triggered as soon as the plaintiff is put on notice of the need to *investigate the possibility* of a fraud. *Lindquist v. Peterson*, 134 Minn. 279, 158 N.W. 426, 428 (1916); *Blegen v. Monarch Life Ins. Co.*, 365 N.W.2d 356, 357-58 (Minn. App. 1985). The law imposes an *affirmative duty* on a plaintiff to inquire once aware of the facts sufficient to put a reasonable person on notice that a fraud claim *may exist*. *Blegen*, 365 N.W.2d at 358; *Bustad*, 116 N.W.2d at 555; *Goellner v. Butler*, 836 F.2d 426, 432-33 (8th Cir. 1988) (applying Minnesota law) (fraud claim arising from infertility caused by intrauterine device was triggered when plaintiff learned the device was expelled from her uterus and that she may have infection; information held sufficient to "put [plaintiff] on notice that IUD *could have* rendered her sterile, and that hospital's statement that it would not do so *may have been false*"). As noted by the Seventh Circuit Court of Appeals:

> The time period provided by a statute of limitation [for fraud] is not for recuperation after learning enough to prevail at trial. It is for *investigation*, and because fraud may be hard to unravel the statutory period is substantial.

*Stockman v. LaCroix*, 790 F.2d 583, 588 (7th Cir. 1986).

The burden is on plaintiffs to prove they did not discover, or reasonably could not discover, facts inconsistent with the alleged-

14

ly fraudulent representations more than six years before commencing the action. *Kassan v. Kassan*, 400 N.W.2d 346, 350 (Minn. App. 1987); *Blegen v. Monarch Life Ins. Co.*, 365 N.W.2d at 357.

Here, plaintiffs knew, more than 19 years before commencing this action, that their experience with the 1974 silo squarely contradicted the representations they relied on at the time of purchase. Plaintiffs saw dark, moldy and spoiled feed *beginning in 1976 and each year thereafter*. Marvin Klehr knew from his 49 years as a dairy farmer that the mold and spoilage was caused by the access of oxygen. He recognized *immediately* he was not getting the protein savings he was promised, and had to feed protein supplements to his cows each and every year after 1975. He had a rash of herd health and reproductive problems *beginning after 1975* which he had never seen before he started using the Harvestore silo, and attributed the difficulties to problems with his feed rations. His contemporaneous farm records revealed that he never got the increased milk production or higher profits he was promised during the entire 17 years he used the silo.

By any objective standard, plaintiffs were on notice long before 1987 that defendants' representations may not have been true. Once aware of such facts, the law imposed upon plaintiffs an *affirmative duty to investigate* the reasons *why* the promised benefits were not coming true. The limitations period afforded plaintiffs six years to make whatever investigation they deemed necessary -- such as consulting with experts or an attorney -- to determine whether or not to commence a lawsuit. Instead, plaintiffs waited 19 years to bring this action, despite year after year of allegedly spoiled feed, severe herd health problems, flat production and generally disappointing product performance. Based

15

on plaintiffs' own sworn testimony, their fraud claim is barred by Minnesota's six-year statute of limitations.

The fact that plaintiffs were unaware of an alleged design defect in the Harvestore silo until 1991 is legally irrelevant and does not toll the running of the statute of limitations. As noted by Judge Doty in *Veldhuizen*, *supra*, "the limitations period *does not wait to run until [plaintiffs] were able to make a causal connection between the failure of the silo to perform as promised and a particular design defect.*" 839 F. Supp. at 676 (emphasis added). Rather, the statute begins to run when plaintiffs discovered the silo was not working as represented. *Id. See also Adkison v. G.D. Searle & Co.*, 971 F.2d 132, 136 (8th Cir. 1992) ("*diagnosis of a causal connection is not necessary* for the limitations period to start running. . . . The limitations period can begin running if the manifested damage, *even if slight*, reveals the *nature* of the injury."); *A.J. Aberman, Inc. v. Funk Building Corp.*, 420 A.2d 594, 601 (Pa. Super. 1980) (once plaintiff noticed leaky roof, failure to determine *why* it leaked did not toll statute); *Coody v. A.H. Robbins Co., Inc.*, 696 S.W.2d 154, 156 (Tex. Ct. App. 1985) (discovery rule speaks only to discovery of injury, not to discovery of all elements of a cause of action).

The precise issue before this Court was squarely decided by Judge Doty in *Veldhuizen*.[4]   In *Veldhuizen*, as in this case, plaintiffs purchased Harvestore silos based on representations they would have no spoilage and higher quality feed because no oxygen would contact the feed, higher milk production, healthier cattle,

---

[4]   Judge Doty's Order granting summary judgment in *Veldhuizen* was issued on December 14, 1993, after the state court Order denying summary judgment in the state court action.

protein savings and more profits.  Contrary to these representa-
tions, plaintiffs realized in the 1970's they had spoiled feed,
lower milk production, more herd health problems and none of the
promised protein savings.  Plaintiffs commenced their lawsuit in
1991, 20 years after purchasing their first Harvestore silo.  The
Court dismissed all of plaintiffs' claims under the statute of
limitations, even though it assumed that the plaintiffs "did not
have actual, subjective knowledge of the alleged fraud until near
the time they filed suit."  839 F. Supp. at 675.  The Court found
that plaintiffs' failure to realize the promised benefits of the
Harvestore silo put them on notice of a possible fraud claim and
triggered the six-year limitations period:

> The evidence shows that the Veldhuizens knew almost from the
> start that the promised benefits which induced them to
> purchase the Harvestore silos did not materialize.  The
> Veldhuizens knew that the amount of spoiled feed in the
> Harvestore silos was more than the promised two percent and
> that oxidation caused feed to spoil.  Besides problems with
> feed quality, the Veldhuizens realized early on that other
> expected benefits of the Harvestore silos had not material-
> ized.  The herd consistently produced less milk once the
> Veldhuizens began using the first Harvestore silos. . . .
> Within a year of using the first Harvestore silo, the
> Veldhuizens knew that they would not eliminate protein
> supplements from the feed as provided.  After the Harvestore
> silos were in use for a few years, it became evident to the
> Veldhuizens that the cattle were not healthier but had more
> health problems than in the past.

839 F. Supp. at 675.

Judge Doty's decision in *Veldhuizen* is consistent with recent
summary judgment rulings issued by numerous courts in other
Harvestore cases, including decisions by the Eighth Circuit Court
of Appeals and several Minnesota state district courts.  In *Miles
v. A.O. Smith Harvestore Products, Inc.*, 992 F.2d 813 (8th Cir.
1993), the Eighth Circuit Court of Appeals affirmed an Order by the
United States District Court for the Western District of Arkansas

17

granting summary judgment based upon the statute of limitations.[5] The plaintiff in *Miles* purchased Harvestore silos in 1973 and 1981, but did not file her lawsuit until 1991. Plaintiff admitted she had spoiled feed, lowered milk production, animal abortions and breeding problems almost immediately after the silos were installed. The district court dismissed plaintiff's claims under Arkansas' discovery rule, stating:

> There can be no doubt that almost immediately after [plaintiffs] began using each of the Harvestore structures they concluded the structures were not performing as promised. . . . We are told that "what [plaintiffs] did not know and could not know was the state of knowledge of AOS and AOSHPI regarding the basic design flaw of its product as displayed in . . . dozens of . . . internal documents which will be exhibited at trial." In other words, [plaintiffs] knew what they had been told was not being realized, but they had absolutely no idea why. . . .
>
> Contrary to plaintiffs' contention, Arkansas law *does not require the plaintiff to make a causal connection between the failure of the item to perform as promised and a particular design defect. Rather, plaintiff merely must discover or the exercise of reasonable diligence should have discovered that the representations at issue were false.* . . . From plaintiffs' depositions it is clear that plaintiffs realized very early on that the units were not operating as represented, *i.e.*, that the representations at issue were false.

*Miles v. A.O. Smith Harvestore Products, Inc.*, Civil No. 91-3069 (W.D. Ark. 1992), slip op. at 6-7 (emphasis added).

On appeal, the Eighth Circuit affirmed, holding that plaintiffs clearly knew or should have known the Harvestore silos were not performing as represented. 992 F.2d at 816. The Court rejected the precise argument made by plaintiffs in this case, namely that the statute of limitations was tolled based on defendants' internal documents, which allegedly proved defendants' knowledge that their

---

[5] A copy of the district court decision in *Miles* is attached to the Shepard Aff. as Exhibit 3.

representations were false:

> A plaintiff's ignorance of his or her right to sue does not
> toll the running of the statute of limitations. [citations
> omitted] The argument depends on the idea that appellant
> did not know that Harvestore intended to deceive her,
> despite ample evidence that Harvestore's representations
> regarding the silo system were untrue.

*Id.* at 816.

Summary judgment is also supported by two recent Minnesota state district court decisions issued since defendants' summary judgment motion was considered in the state court action. *See Simon v. A.O. Smith Harvestore Products, Inc.*, Nobles County File No. CX-92-582 (Sept. 10, 1993);[6] *Cross v. A.O. Smith Corporation*, Martin County File No. C7-92-307 (Nov. 30, 1993).[7] In both *Simon* and *Cross*, the plaintiffs, who purchased their Harvestore silos in the mid-1970's and filed their lawsuits in 1991, were barred by the statute of limitations from suing the defendants under virtually identical facts and theories.

Decisions from Harvestore cases in other jurisdictions also support summary judgment here. *See Horn, et al. v. A.O. Smith Corp.*, Civ. No. 1:92cv232 (N.D. Ind. Feb. 18, 1994);[8] *Nelson v. A.O. Smith Harvestore Products, Inc.*, File No. 86-4230-R (D. Kan. 1990)[9] (fraud claims barred by statute of limitations where plaintiffs knew almost immediately that promises of enhanced feed quality, protein savings and increased profits were false);

---

[6] A copy of the district court's Order and Memorandum in *Simon* is attached to the Shepard Aff. as Exhibit 4.

[7] A copy of the court's Findings of Fact, Conclusions of Law and Order for Judgment in *Cross* is attached to the Shepard Aff. as Exhibit 5.

[8] A copy of the Court's Order in *Horn* is attached to the Shepard Aff. as Exhibit 6.

[9] A copy of the *Nelson* opinion is attached to the Shepard Aff. as Exhibit 7.

*Johnston v. AgriStor Credit Corp.*, Civ. No. 84-4421-S (D. Kan. 1987)[10] (fraud claim brought eight years after purchase of silo barred where plaintiffs knew almost immediately that promises of protein savings, healthier cattle and increased profits were false).

In *Horn, supra*, decided dated February 18, 1994, U.S. District Court Judge William C. Lee dismissed five separate Harvestore lawsuits which were consolidated for purposes of discovery and pre-trial motions. The five plaintiffs purchased their first Harvestore silos in August 1977, May 1981, April 1976, March 1978 and December 1980, respectively. All five plaintiffs sued the defendants in the fall of 1992, alleging fraud claims based on representations that the silos would prevent oxygen from contacting the feed, thereby eliminating spoilage; that the silos would produce higher quality feed, thereby eliminating or greatly reducing the need for protein supplements; and that the silos would increase milk production and farm profits. The court granted summary judgment in all five cases, finding that in each case the plaintiffs were aware soon after they began using their silos that the Harvestore silos were not performing as represented. *Id.*, slip op. at 36-40.

Like the cases cited above, plaintiffs in this case knew almost immediately after they began using the Harvestore silo that their experience was directly contrary to the representations which allegedly induced them to buy it. Plaintiffs' admitted knowledge of these facts put them on notice as early as 1975, and certainly long before 1987, that the silo was not working as represented.

---

[10] A copy of the *Johnston* opinion is attached to the Shepard Aff. as Exhibit 8.

Plaintiffs had six years under Minnesota law to investigate *why* they were not realizing the results they were promised, and to determine whether or not to bring a lawsuit. Instead, they waited 19 years to do so. For these reasons, defendants' motion for summary judgment on plaintiffs' fraud claim must be granted.[11]

## II. THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' RICO CLAIMS

Plaintiffs' federal RICO claims are likewise barred by the statute of limitations. A four-year statute of limitations applies to civil RICO claims. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156-57 (1987). A civil RICO claim is time-barred if it is filed more than four years from the time that the plaintiff "discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 154 (8th Cir. 1991), *quoting Bivens Gardens Office Bldg., Inc. v. Barnett Bank*, 906 F.2d 1546, 1554-55 (11th Cir. 1990),

---

[11] The Minnesota Court of Appeals' unpublished decision in *Buller v. A.O. Smith Harvestore Products, Inc.*, 1993 WL 413001 (Minn. App. 1993), *review granted* (Dec. 27, 1993), is inapposite. In *Buller*, the Court of Appeals reversed a judgment in favor of AOSHPI on statute of limitations grounds finding, based on the unique facts of that case, that plaintiffs could not reasonably have discovered the alleged fraud. The *Buller* case is easily distinguishable from this case. First, the plaintiffs in *Buller* brought their lawsuit only nine years after purchasing their first Harvestore whereas plaintiffs in this case waited over 19 years before bringing this action. Second, the court in *Buller* based its decision on evidence that plaintiffs were repeatedly told by defendants that their problems with the Harvestore silos were the result of their own mismanagement or factors other than the silo itself. There are no such facts in the record in this case. Third, when deciding issues of state law, this Court is bound to follow decisions by the Minnesota Supreme Court but not those of the Court of Appeals, particularly where its decisions are unpublished. *See Nelson Distributing, Inc. v. Stewart-Warner Industrial Balancers*, 808 F. Supp. 684, 687 (D. Minn. 1992). As noted in *Veldhuizen*, the *Buller* case is distinguishable and is no impediment to summary judgment. *See Veldhuizen*, 839 F. Supp. at 676, n.6. Finally, and perhaps most importantly, the Minnesota Supreme Court granted AOSHPI's Petition for Review of the Court of Appeals' disposition of the statute of limitations issue (while denying plaintiffs' cross-petition), raising doubts about the continuing validity of the Court of Appeals' decision. Oral arguments were held in the Supreme Court in *Buller* on May 10, 1994, and the case is presently under advisement.

*cert. denied*, 111 S. Ct. 1695 (1991).[12]  Thus, the date when the source of injury and the existence of a pattern ought to have been discovered is subject to a standard of reasonableness.  *Veldhuizen v. A.O. Smith Corp.*, Civ. No. 4-92-1131 (D. Minn. Dec. 30, 1993), slip op. at 2.[13]

In this case, given the extensive pattern of racketeering activity alleged by the plaintiffs in their Amended Complaint, the discovery rule governing plaintiffs' RICO claims is materially identical to the discovery rule governing their common law fraud claims.  In *AgriStor Financial Corp. v. Van Sickle*, 967 F.2d 233 (6th Cir. 1992), the Van Sickles brought RICO claims against the defendants alleging they were defrauded by a series of advertisements published over a period of years relating to the Harvestore silos.  Like the plaintiffs in this case, the Van Sickles alleged "predicate acts consisting of mail and wire fraud relating to the promotion, sale and lease of silos."  *Id.* at 241-42.  The Sixth Circuit, applying the *Bivens* discovery rule adopted by the Eighth Circuit, held that the Van Sickles should have discovered a "pattern," for purposes of triggering the statute of limitations on their RICO claims, as soon as they became aware of problems with feed, milk production and animal deaths.  Based on their knowledge of these problems and the pattern of racketeering alleged regarding the promotion of the product, the Sixth Circuit held, as a matter of law, that the Van Sickles "should have determined that the

---

[12]  In adopting the *Bivens* discovery rule, the Eighth Circuit noted that the *Bivens* rule "better reflects the underlying policy of a statute of limitations *requiring diligence* on the part of the plaintiff. . . ."  *Id.* at 154.

[13]  A copy of Judge Doty's December 30, 1993 Order in *Veldhuizen* addressing the statute of limitations applicable to plaintiffs' RICO claims is attached to the Shepard Aff. as Exhibit 9.  Judge Doty denied plaintiffs' motion to amend their Complaint to add RICO claims in a separate unpublished decision, holding the claims were barred as a matter of law by the statute of limitations.  *Id.*

representations were part of a pattern *at the same time it should
have discovered that the silos caused the alleged problems on the
dairy farm.*" *Id.* (emphasis added).

Likewise, in *Veldhuizen, supra,* Judge Doty denied plaintiffs'
motion to amend to add RICO claims on the grounds that such claims
were barred by the statute of limitations.  The court found that
the limitations period on plaintiffs' RICO claims began to run at
the same time as plaintiffs' fraud claim:

> [P]laintiffs should have known that the alleged misrepresen-
> tations and injuries were part of a pattern at the same time
> they should have discovered the Harvestore silos were
> causing the problems experienced by their herd.  Plaintiffs
> allege predicate acts consisting of mail fraud related to
> the promotion, sale and lease of Harvestore silos.  Plain-
> tiffs rely on alleged misrepresentations made between 1973
> and 1991.  Plaintiffs knew almost from the start that their
> four Harvestore silos were not performing as promised. . . .
> The court holds that as a matter of law plaintiffs should
> have discovered by 1980 that the alleged misrepresentations
> and their injuries were part of a pattern.

*Id.*, slip op. at 3.  *See also Schrag v. Dinges*, 150 F.R.D. 664, 676
(D. Kan. 1993) ("Notice of a pattern of racketeering activities
triggers the statute of limitations even if the notice does not
reveal the entire scope of the scheme involved."); *Diamonds Plus,
Inc. v. Kolber*, 960 F.2d 765, 769 (8th Cir. 1992) (advertisements
placed in magazines establishes "pattern" for purposes of RICO).

Here, plaintiffs' own pleadings unequivocally demonstrate that
plaintiffs knew or should have known of an alleged pattern at the
time they discovered the Harvestore silo was not performing as
represented and causing injury to their dairy operation.  Their
Amended Complaint alleges that they received fraudulent advertising
in the mail from the defendants *from 1969 to 1991.*  *See* Amended
Complaint at ¶¶ 10, 15-16.  The Amended Complaint specifically
identifies *20 pieces of advertising* or films plaintiffs allegedly

23

received and relied upon before purchasing the Harvestore silo in 1974 (*Id.* at ¶ 10), and *38 additional pieces of advertising* or films they allegedly received after purchasing the silo (*Id.* at ¶¶ 15-16). Plaintiffs allege these promotional materials were contained in a variety of farm magazines disseminated via the United States mail to the farming public generally, and to the plaintiffs specifically, *for a period of more than 20 years*. *Id.* Plaintiffs allege that all of the advertising contained the same basic fraudulent representations regarding the performance capabilities of the Harvestore silos which they relied on in purchasing their silo and which caused damage to their dairy business. *Id.* at ¶¶ 19-22. *See also* RICO Case Statement of Marvin and Mary Klehr dated February 11, 1994, at ¶ 5(c).

Based on these facts, the plaintiffs knew or should have known that the alleged misrepresentations were part of a pattern of continuing activity at the same time they discovered the Harvestore silo was not performing as represented. Based on plaintiffs' own sworn testimony and pleadings, the four-year limitations period on plaintiffs' RICO claims began to run as early as 1975, and certainly long before 1989. *See Van Sickle*, 967 F.2d at 241-42; *Veldhuizen*, slip op. at 3; *Caproni v. Prudential Securities, Inc.*, 15 F.3d 614 (6th Cir. 1994) ("[b]ecause these [misrepresentations] were made at different times, plaintiffs also should have known they were part of a pattern of misrepresentation" more than four years prior to filing suit).

III. **THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' STATUTORY CLAIMS**

In addition to asserting claims for common law fraud, Counts VI through IX of the Amended Complaint assert claims for violations of MINN. STAT. § 325F.67, §§ 325F.68-.70, § 325D.13 and 325D.44,

24

respectively. The statute of limitations applicable to claims for a "liability created by statute" under Minnesota law is six years. MINN. STAT. § 541.05, subd. 1(2); *Veldhuizen*, 839 F. Supp. at 676-77; *Estate of Riedel v. Life Care Retirement Communities, Inc.*, 505 N.W.2d 78, 83 (Minn. 1993). Unlike the statute governing fraud claims, subdivision 1(2) of MINN. STAT. § 541.05 does not incorporate a "discovery rule." Thus, the limitations period on plaintiffs' claims for the alleged statutory violation was triggered on the date of sale, when the statutory violations allegedly occurred. *Veldhuizen*, 839 F. Supp. at 676. Accordingly, plaintiffs' statutory claims are barred as a matter of law.

## IV. THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' NEGLIGENCE CLAIM

Count V of the Amended Complaint alleges a claim for negligent misrepresentation. The statute of limitations for negligence claims is six years. MINN. STAT. § 541.05, subd. 1(5). "The general rule with respect to actions for negligence is that the cause of action accrues and the statute of limitations starts to run when the negligent act or omission *causes injury* on which the injured party could maintain an action." *Wittmer v. Ruegemer*, 419 N.W.2d 493, 496 (Minn. 1988). Here, because plaintiffs allege they were injured as early as 1975, Count V is barred by the statute of limitations.[14]

### CONCLUSION

For all of the reasons set forth above, defendant A.O. Smith Harvestore Products, Inc. respectfully requests that the Court

---

[14]   In addition to being barred by the statute of limitations, plaintiffs' negligent misrepresentation claim is also barred under Minnesota's *Superwood* doctrine. The damages plaintiffs seek to recover are economic losses arising from a commercial transaction. Accordingly, plaintiffs' claim in negligence is precluded by the Uniform Commercial Code. *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159, 162 (Minn. 1981); *Veldhuizen*, 839 F. Supp. at 637; *AgriStor Leasing v. Guggisberg*, 617 F. Supp. 902, 908 (D. Minn. 1985).

grant its motion for summary judgment and dismiss all of plain-
tiffs' claims based on the applicable statute of limitations.

Dated: May 18, 1994

Frederick W. Morris (#75358)
Blake Shepard, Jr. (#161536)
**LEONARD, STREET AND DEINARD**
    **PROFESSIONAL ASSOCIATION**
Suite 2300, 150 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500
**ATTORNEYS FOR DEFENDANT A.O. SMITH**
    **HARVESTORE PRODUCTS, INC.**

BS\AOSHPI\KLEHR2\SummJudg.pld          26